UNITED STATES v. NEW DEPARTURE MFG. CO. et al.

(District Court, W. D. New York. March 12, 1913.)

1. MONOPOLIES (§ 31*)—SHERMAN ANTI-TRUST ACT—VIOLATION—INDICTMENT —"ENGAGE IN CONSPIRACY."

Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), provides that every contract, combination, or conspiracy in restraint of trade or commerce among the several states is illegal, and that every person who shall make any such contract or engage in any such combination or conspiracy shall be guilty of a misdemeanor. Section 2 declares that every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce within the several states, or with foreign nations, shall be guilty of a misdemeanor. *Held*, that the phrase "engage in such combination or conspiracy," in section 1, was used in a broad sense, and included, not only such persons as initiated such a conspiracy, but also those who afterwards engage therein; and hence an indictment, charging that defendants were engaged in a conspiracy among themselves to control and monopolize interstate commerce in the manufacture and sale of coaster brakes among the several states, followed by an allegation of overt acts tending to effectuate the conspiracy, was not defective for failure to charge directly the formation and existence of the conspiracy, the words "engage in," as so used, signifying to embark in, take part in, or enlist in, meaning substantially the same thing as to conspire.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

2. MONOPOLIES (§ 31*)—COMBINATION IN RESTRAINT OF TRADE—INDICTMENT —LAWFUL PURPOSE.

Where an indictment for violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), charged that defendants were engaged in a combination and conspiracy to monopolize and control the trade in and manufacture and sale of coaster brakes in the United States, and that for this purpose defendants, in combination with an association, had committed certain specified acts tending to restrain competition among themselves, including the assignment of pretended patent license rights, tending toward the establishment of uniform prices for the products, and an agreement between them for noncompetitive discounts to jobbers, dealers, etc., all of which were alleged to have been done with an unlawful intent to control the market, the indictment was not defective, on the theory that the acts charged were in perfect harmony with a lawful purpose.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

3. MONOPOLIES (§ 31*)—SHERMAN ANTI-TRUST ACT—COMBINATION IN RESTRAINT OF TRADE—PATENT RIGHTS—INDICTMENT.

In a prosecution of manufacturers of coaster brakes for combination in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), certain counts of the indictment alleged that defendant, the N. D. Company, was the owner of a basic patent for making such brakes, and issued licenses to manufacture thereunder, charging, however, that the defendant corporations were separately the owners of patents and patent rights for improvements in the coaster brake and other bicycle and motor cycle accessories, but that the defendants, to effectuate their plan to restrain trade, feigned the making of a license agreement ostensibly covering a part, but not the whole, of the coaster brake manufactured by the N. D. Company, charging that the pretended license agreements, which were to be en-

tered into simultaneously by the N. D. Company as ostensible licensor with the remaining corporation defendants as ostensible separate licensees, were to be in all respects uniform in character, were to contain schedules of uniform and noncompetitive prices, restrictions upon all sales, etc. *Held*, that such averments negatived an inference that the licenses were for a basic patent, but that the conditions were imposed on competitors in good faith and without an intention to violate the statute, since the fact that patents are issued to various persons or corporations, does not entitle them to combine to restrain the manufacture or sale of the patented article or to enhance prices in restriction of commerce.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

4. STATUTES (§ 47*)—VALIDITY—DEFINITENESS—SHERMAN ANTI-TRUST ACT.
   Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), providing that every contract, combination, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is illegal, and that every person who shall make such contract or engage in such combination or conspiracy shall be guilty of a misdemeanor, and that every person or persons who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several states, shall be guilty of a misdemeanor, is not unconstitutional because of indefiniteness.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 47; Dec. Dig. § 47.*]

5. INDICTMENT AND INFORMATION (§ 87*)—TIME OF OFFENSE—LIMITATIONS.
   Where an indictment, charging a conspiracy in restraint of interstate trade or commerce in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), alleged that defendants continuously, during the period from July 1, 1907, to January 8, 1912, committed the unlawful acts specified, it sufficiently alleged that an offense was committed within the three-year statute of limitations.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 244–255; Dec. Dig. § 87.*]

6. INDICTMENT AND INFORMATION (§ 99*)—COUNTS—INCORPORATION OF PREVIOUS COUNTS—REFERENCE.
   It is proper to incorporate in a subsequent count by reference facts alleged in a previous one.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 270, 270½; Dec. Dig. § 99.*]

Indictment against the New Departure Manufacturing Company and others for alleged violation of sections 1 and 2 of the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). Demurrer to indictment overruled.

See, also, 195 Fed. 778.

John Lord O'Brian, of Buffalo, N. Y., for the United States.

Kenefick, Cooke, Mitchell & Bass, of Buffalo, N. Y., Gross, Hyde & Shipman, of Hartford, Conn., and Holmes, Rogers & Carpenter, of New York City (Delevan A. Holmes, of New York City, Wm. Waldo Hyde, of Hartford, Conn., Lyman M. Bass, of Buffalo, N. Y., and Louis E. Hart, of Chicago, Ill., of counsel), for defendants.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

HAZEL, District Judge. The defendants, the New Departure Manufacturing Company and 5 other corporations and 18 individuals, have been indicted in eight counts for the violation of sections 1 and 2 of the Sherman Anti-Trust Act, passed July 2, 1890 (Act July 2, 1890. c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), being charged with unlawfully engaging in a conspiracy in restraint of interstate trade and commerce among the several states and foreign nations, and with attempting to monopolize such interstate trade and commerce.

The indictment, to which the defendants have demurred, after charging in general terms that the corporation defendants were separately engaged in different states in the business of manufacturing bicycle and motor cycle coaster brakes and accessories, of a distinctive type and design from those manufactured and sold by any other of the corporation defendants, under certain letters patent and certain patent license rights owned by them separately, alleges that the individual defendants were officers of the said corporations, vested with power and authority to do and perform the unlawful acts and purposes of the conspiracy, with the exception of Huntington and Jackson, who, however, were possessed of similar power and authority to accomplish the unlawful acts and purposes of the conspiracy by reason of their appointment as arbitrators of the association formed by the said corporations; that the defendants produced in the aggregate 85 per cent. of the entire output of bicycle and motor cycle coaster brakes and accessories consumed in the United States, and had power, by association and co-operation, to fix and control the prices thereof in the United States markets. The indictment substantially avers that said corporations were separate and distinct entities, and should each have conducted its business in competition with the others as to prices, rebates. discounts, and conditions of sales, and that such businesses would have been free from unlawful restraint if the defendants had not engaged among themselves in the conspiracy complained of.

The direct accusation is that continuously from the 1st of July, 1907. down to the date of the indictment, the defendants unlawfully. knowingly, and with intent to do so engaged in a conspiracy among themselves in undue, unreasonable, direct, and oppressive restraint of interstate business, trade, and commerce. The first count of the indictment charges the defendants with engaging in a conspiracy among themselves to restrain interstate trade; the second, to restrain the interstate trade of their competitors; the third, to restrain the interstate trade of the corporation defendants and individual jobbers and manufacturers of coaster brakes; the fourth, fifth, and sixth counts detail acts of conspiracy without referring to the proposed patent license; while the seventh and eighth counts, after properly referring to the facts of the preceding counts, allege an unlawful attempt on the part of the defendants to monopolize the interstate trade and commerce in the said articles. A summary of the particular methods detailed in the indictment for effectuating the claimed conspiracy follows:

(1) By agreeing upon prices for the products manufactured by the corporation defendants, and maintaining them; (2) by establishing uniform and noncompetitive discounts to be offered to manufacturers, jobbers, and deal-

ers; (3) by selling the manufactured product at noncompetitive prices, rebates, and discounts largely in excess of the prices which would have prevailed if the defendants had not engaged in the conspiracy; (4) by refusing to sell coaster brakes except on the terms and conditions agreed upon by defendants; (5) by agreeing upon a form of contract with prospective buyers; (6) by refusing to sell products to any manufacturer or jobber not agreeing not to deal in similar products manufactured by others; (7) by instigating patent litigation, or threatening with prosecution dealers in the commodity of a competitor; (8) by devising a pretended license agreement, under which the New Departure Manufacturing Company was to act as ostensible licensor, and the other corporation defendants as licensees, for the manufacture and sale of said coaster brakes and accessories under patents claimed to be owned by the former, and covering only parts thereof; (9) by entering at the same time into license agreements whereby the licensor agrees not to grant additional licenses without the consent of the licensees; (10) by granting uniform licenses containing schedules of noncompetitive prices, discounts, and restrictions on sales to outside dealers; (11) by the discontinuance of pending litigation between the various defendants, and agreement not to question the validity of any patents owned by licensees; (12) by the payment of pretended royalties to the New Departure Manufacturing Company, which were credited back in return for the use of other letters patent; (13) by arranging for the deposit with an arbitrator of a guaranty fund to insure against breach of license agreement between licensor and licensees, and for the settlement of all disputes arising among the defendant corporations by said arbitrator; (14) by agreeing upon arbitrary noncompetitive prices for the sale and resale of coaster brakes and accessories by jobbers, and by agreement to sell only to listed jobbers as per arrangement: (15) by giving discounts only to such manufacturers and jobbers as the defendant corporations should jointly sanction; and (16) by carrying on litigation against competitors, and by preventing members of the combination from selling to competitors.

The general claim of the government is that it was the purpose and intention of the defendants to discourage and destroy competition by intimidation and coercion, by the institution of litigation against infringers of patents, and by the pretense of a basic license arrangement, running exclusively to the defendant corporations, binding each to a strict observance of the selling prices of the manufactured product, future prices, restrictions on sales to jobbers, retail dealers, and customers, etc.

Defendants contend that the indictment is fatally defective because it fails to charge, first, the formation of a conspiracy in violation of the act under consideration, as an averment that the defendants "are engaged in a conspiracy among themselves" to accomplish an unlawful end is not the equivalent of a direct charge of the formation or existence of a conspiracy; second, that the act is too indefinite to sustain a criminal prosecution; and, third, that the facts upon which the government relies are equally as consistent with a lawful agreement to restrain interstate trade and commerce as with an unlawful agreement.

[1] With respect to the asserted failure to charge a conspiracy, there was considerable discussion at the bar; it being contended, inter alia, that the existence of the conspiracy cannot be shown by the averment of the commission of overt acts. Sections 1 and 2 of the federal Anti-Trust Act read as follows:

"1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The first part of section 1 states that every contract, combination, or conspiracy in restrain of trade or commerce among the several states is illegal, while the sentence following is declarative of the character of the offense. Was it necessary to directly charge the existence or formation of a conspiracy upon which to base an accusation that the defendants engaged in a combination or conspiracy? The quoted provision is perhaps not as clearly expressed as it might be; but I think the phrase "engage in such combination or conspiracy" is used in a broad sense, and includes, not only such persons as initiate a conspiracy, but also those who afterwards engage therein. In United States v. Greenhut (D. C.) 50 Fed. 469, the indictment was held insufficient, because the crime was not charged in the language of the statute or its equivalent. In this case the precise language of the statute is used to charge the offense, and in addition the particular acts done or to be done by the defendants to effectuate the crime are set forth. It is a cardinal rule of criminal law that an indictment is not invalid for insufficiency, if it embraces the language of the statute and covers and includes the essential ingredients of the offense with sufficient certainty to apprise the defendant of the charge that he will be called upon to meet. United States v. Britton, 108 U. S. 193, 2 Sup. Ct. 525, 27 L. Ed. 703; Rosen v. United States, 161 U. S. 29, 16 Sup. Ct. 434, 480, 40 L. Ed. 606; Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; United States v. Patterson (D. C.) 201 Fed. 697, opinion by Hollister, J.

It is true that indictments under section 5440 of the Revised Statutes (U. S. Comp. St. 1901, p. 3676) must contain a definite charge of conspiracy to defraud the government or to commit an offense against the United States, and resort cannot be had to a statement of overt acts to compensate for such omission; yet this rule of pleading, repeated in many adjudications cited in defendants' brief, is not believed to be controlling in a prosecution charging the violation of the Sherman Act, which evidently does not require the averment of an overt act to constitute the offense the gravamen of which is to combine or conspire, or to engage in a combination or conspiracy. United States v. Kissel (C. C.) 173 Fed. 823; United States v. Patten (C. C.) 187 Fed. 664, affirmed by the Supreme Court, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. ——. In legal parlance, the words "engage in" signify embark in, take part in, or enlist in, and when they are used in connection with the words "combination or conspiracy," as in the act,

they mean substantially the same thing as to conspire; for one who engages in a conspiracy becomes a conspirator, regardless of whether or not the conspiracy has previously been initiated. In describing the offense without limitations, or without the inclusion of a condition that an overt act need be first committed to complete the offense, Congress doubtless had in mind this definition. When the Patten Case, supra, was decided by the Supreme Court, a writ of error having been sued out by the government, Mr. Justice Van Devanter, who delivered the opinion of the court, said that such act made it a criminal offense to "engage in" a "conspiracy in restraint of trade or commerce among the several states." The particular phrasing of the indictment against Patten is not mentioned, but it was apparently considered that the offense consisted of engaging in a conspiracy.

[2] Counsel for defendants have elaborately argued that the averments in the indictment are in perfect harmony with a lawful purpose, and that the conclusion that the defendants intended to destroy competition among themselves is insufficiently supported; but in this I do not agree. The acts committed, or to be committed, by the defendants, in combination with an association, the assignment of pretended license rights tending towards the establishment of uniform prices for the products, and the agreement upon noncompetitive discounts to jobbers, dealers, etc., are evidential features from which the intention of the defendants must be ascertained. As said in Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518:

"Where acts are done with an unlawful intent and an unlawful combination results, the offense is committed, even though the acts done were in themselves perfectly innocent and lawful. But this act directs itself against the dangerous probability, as well as against the completed result."

[3] Upon this feature of the controversy it will be enough to briefly advert to the contention by defendants that inferentially the indictment (counts 1, 2, and 3) alleges that the defendant, the New Departure Manufacturing Company, was owner of a basic patent for making coaster brakes, and issued licenses to manufacture thereunder. Reference to the indictment, however, discloses that the patent license agreement, separately considered and unconnected with any pretense, is not claimed to have been an element of unlawfulness. Careful reading thereof shows that the asserted culpability of the defendants is primarily based upon the allegation that the defendant corporations were separately owners of patents and patent rights for improvements in the coaster brake and other bicycle and motor cycle accessories, differing from those held by the other corporation defendants, but that the defendants, to effectuate their plan or scheme to restrain trade, feigned the making of a license agreement ostensibly covering a part, but not the whole, of the coaster brake manufactured by the New Departure Manufacturing Company. Importance is attached to that part of the indictment charging that:

"The said pretended license agreements which were to be entered into simultaneously by the said New Departure Manufacturing Company as ostensible licensor with the remaining corporation defendants as ostensible separate licensees were to be in all respects uniform in character, were to

contain schedules of uniform and noncompetitive prices, restrictions upon all sales of the aforesaid merchandise and products to be made by any of said corporations defendants to jobbers and manufacturers," etc.

This assertion, when considered with other averments, would seem to clearly negative the inference that the licenses were for a basic patent, or that conditions were imposed on competitors in good faith and without an intention to violate the statute under consideration. None of the separate patent rights owned by the defendant corporations hinged or depended upon license rights transferred by the New Departure Manufacturing Company, and the right to manufacture was not derived from it.

We are not at this time concerned with the scope of the claims of such license patent, or with the right to license others to manufacture or sell the patented articles, or to impose license conditions, or to fix the prices of sale to jobbers or dealers and by them to customers, and therefore the authorities cited by counsel for defendants, showing that patentees have the right to license others and to impose conditions as to price, etc., are not now applicable. Whether the plan was lawfully devised, without an intention to monopolize or engage in a conspiracy in restraint of interstate trade, is a question not now determinable, though it may be remarked that the general scheme by which the prices were to be fixed and controlled, assuming the truthfulness of the averment as to the grant of a pretended license, possesses an ingenious intermingling of various business interests, which no doubt justifies the conclusions of the indictment that the intention was to discourage and destroy competition and to attempt to create a monopoly.

In the Bath-Tub Trust Case, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. ——, so called, a case recently decided by the Supreme Court of the United States, a situation somewhat similar to this in respect to quantity of output and license agreement was presented, and the court said:

"The trade was, therefore, practically controlled from producer to consumer, and the potency of the scheme was established by the co-operation of 85 per cent. of the manufacturers. * * * The agreements therefore clearly transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman law."

The Supreme Court then pointed out the distinction between that case and the case of Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; but nevertheless the intimation in the opinion is clear that the monopoly secured to the patentee by the issuance of a patent cannot be designedly used to form a combination or conspiracy between manufacturers and dealers to accomplish a restraint of trade such as the Anti-Trust Act prohibits. Upon this subject the Circuit Court of Appeals for the Third Circuit, in National Harrow Co. v. Hench et al., 83 Fed. 36, 27 C. C. A. 349, 39 L. R. A. 299, has aptly said:

"The fact that the property involved is covered by letters patent is urged as a justification; but we do not see how any importance can be attributed to this fact. Patents confer a monopoly as respects the property covered by

them, but they confer no right upon the owners of several distinct patents to combine for the purpose of restraining competition and trade. Patented property does not differ in this respect from any other. The fact that only the patentee may possess himself of several patents, and thus increase his monopoly, affords no support for an argument in favor of a combination by several distinct owners of such property to restrain manufacture, control sales, and enhance prices. Such combinations are conspiracies against the public interests, and abuses of patent privileges."

The language quoted was cited with approval by Judge Coxe in National Harrow Company v. Hench et al. (C. C.) 84 Fed. 226.

In Blount Manufacturing Co. v. Yale & Towne Mfg. Co. (C. C.) 166 Fed. 557, of the patentees' privilege of combining their patent rights the court said:

"Where, however, each patentee continues to make his own goods under his own patents, and seeks to enhance his profits by agreement with creditors who make either patented or unpatented articles, then it seems to follow that the agreement of each to restrain his own trade cannot be regarded merely as an incident to the assignment of patent rights. The patentee then restrains his own trade, not for the purpose of enhancing the value of the license which he grants, but for the purpose of enhancing the value of his trade by removing competition."

So here, as claimed by the government, the license agreements were resorted to as a subterfuge to aid in stifling competition in trade and commerce, and to enhance the value of the respective businesses of the defendant, and to create a monoply in their productions. In Sanitary Manufacturing Co. v. United States (the Bath-Tub Trust Case) the Supreme Court clearly supports the view that patentees' rights are limited by the Anti-Trust Act, as the following excerpt from the opinion shows:

"Rights conferred by patents are, indeed, very definite and extensive; but they do not give any more than other rights a universal license against positive prohibitions. The Sherman Law is a limitation of rights—rights which may be pushed to evil consequences, and therefore restrained."

[4] It is next objected that the Sherman Act is unconstitutional; but as to this ground of demurrer it is enough to say that since the hearing, or just prior thereto, Judge Hollister, in United States v. Patterson (D. C.) 201 Fed. 697, expressly held to the contrary, and stated in his opinion that, prior to his passing upon the constitutionality of the act, it had already been held constitutional by Judge Angel sitting at the trial of the Bath-Tub Trust Case, by Judge Hand in the Sugar Trust prosecution, and by Judge Putnam in the Shoe Machinery Trust Case (United States v. Winslow [D. C.] 195 Fed. 578). As such decisions are in complete accord with my own views, I am persuaded that the Anti-Trust Act as a criminal statute is a valid enactment.

[5] It is further objected that the offenses are not averred to have been committed within three years, and criticism is made of the phrasing "during said period" in the indictment; but as it is also alleged that the unlawful acts were committed by the defendants "continuously during a period of time from the 1st day of July, 1907, to the present 8th day of January, 1912," the time is stated within the

statutory limitations with sufficient definiteness. Glendale Woolen Mills v. Protection Ins. Co., 21 Conn. 19, 54 Am. Dec. 309.

[6] The seventh and eighth counts, which aver an attempt to monopolize the business carried on by the defendants, are also criticised as being too vague, uncertain, and indefinite. This objection has already been sufficiently answered by what has been said in passing upon the preceding counts. It was not improper to incorporate therein by reference the facts specified in counts 1, 2, and 3. Crain v. United States, 162 U. S. 634, 16 Sup. Ct. 952, 40 L. Ed. 1097; Blitz v. United States, 153 U. S. 315, 14 Sup. Ct. 924, 38 L. Ed. 725.

Assuming, then, as we must, that all the facts and circumstances as summarized herein are true, it is thought to be plainly shown that the continuation of such acts by confederation or concert of action on the part of the defendants tends towards the creation of a monopoly in the manufacture of the specified articles. Indeed, by the methods and acts complained of, the commingling of separate interests in separate patent rights, by the issuing of a pretended license for a pretended basic patent, with the intention of fixing uniform prices and discounts and imposing other conditions, benefits and advantages were secured which may be enjoyed only by a separate patentee in the protection of his true monopoly. It was such courses of procedure by industrial interests in whatever form or guise that the Anti-Trust Act was designed to check and prevent.

The demurrers are overruled on all grounds, and the defendant corporations and individuals are required to plead to the indictment at this regular term of court.